**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**Case No. _____**

|  |  |
|---|---|
| IN THE MATTER OF THE *EX PARTE* APPLICATION OF ANDREW REGINALD YEO AND GESS MICHAEL RAMBALDI  FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | ) ) ) ) ) |

_____

**_EX PARTE_ APPLICATION FOR AN ORDER
TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782
AND INCORPORATED MEMORANDUM OF LAW**

Applicants Andrew Reginald Yeo and Gess Michael Rambaldi (together, the "Applicants") respectfully submit this *Ex Parte* Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 (the "Application") from banks and a wire-transfer clearing house located in this District about various entities believed to be controlled by Paul Rennie ("Mr. Rennie"). The requested relief is for the purpose of obtaining limited, but important, discovery for use in a contemplated proceeding claiming breach of a settlement agreement (the "Breach of Settlement Agreement Proceeding") before the Federal Court of Australia, Victoria District Registry (the "Australian Federal Court").

This Court approved a prior application concerning the Breach of Settlement Agreement Proceeding on January 8, 2018 (the "Prior Application"), and the resulting discovery has revealed additional accounts that appear to be owned by, or held for the benefit of, Mr. Rennie.  Applicants now seek the Court's assistance obtaining discovery concerning these additional accounts and the entities in whose name they are held.  The filing of the Prior Application had been expressly approved by the Australian Federal Court.  Applicants have again sought the Australian Federal

1

Court's approval of the filing of this Application, and such approval was granted on October 11, 2018.

## I.     JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1782(a).

2.     Venue in this District is proper under 28 U.S.C. § 1391 because the intended subpoena recipients are found in this District.

## II.     RELEVANT INDIVIDUALS AND ENTITIES

### A.  THE APPLICANTS

3.     The Applicants are the liquidators of two Australian companies, Rennie Produce Pty Ltd ("RP") and Rennie Produce (Aust) Pty Ltd ("RPA") (together, the "Rennie Companies"), before the Australian Federal Court (the "Australian Liquidation Proceeding"). *See* October 11, 2018 Declaration of Andrew Reginald Yeo (the "Yeo Decl.") ¶ 17.

### B.  MR. RENNIE AND THE RENNIE COMPANIES

4.     The Rennie Companies were predominantly in the business of growing potatoes in Australia. *See id*. ¶ 6.

5.     At all material times, Mr. Rennie was the director of the Rennie Companies. *See id*. ¶ 18.

6.     On October 3, 2012, the Applicants, Mr. Rennie, and certain of his companies and affiliates[1] (together, the "Rennie Parties") executed a settlement agreement requiring the

---

[1] These were Paul Nicholas Rennie; Bridgit Rennie; Agren Pty Ltd; Agrico Produce Pty Ltd; Agtec Agriculture Pty Ltd; Australian Cherry Company Pty Ltd; Bridland Pty Ltd; Camira Investments

repatriation into Australia of assets under Mr. Rennie's control to satisfy a portion of the Rennie Companies' outstanding debt to the Australian Taxation Office (the "Settlement Agreement"). *See id.* ¶ 27. True and Correct copies of the October 3, 2012 Settlement Agreement are attached as Exhibit 10 to the Yeo Decl.

7.     The Applicants believe Mr. Rennie is in breach of the Settlement Agreement for failing to repatriate assets owned by various offshore entities that are registered in the British Virgin Islands ("BVI"), Guernsey, and Hong Kong and that appear to hold funds or assets for his benefit. *See* Yeo Decl. ¶¶ 47, 48, 50, 52.

### C. THE SUBPOENA RECIPIENTS AND DISCOVERY TARGETS

8.     In furtherance of their contemplated Breach of Settlement Agreement Proceeding, the Applicants seek to obtain discovery from various correspondent banks and a wire-transfer clearing house located in this District (the "Subpoena Recipients") about payments to or from Mr. Rennie and entities believed to be under Mr. Rennie's control (the "Discovery Targets").[2] Specifically, the Applicants seek to obtain evidence showing that the Discovery Targets have undisclosed cash assets that they have been maintaining and moving outside Australia. As set out more fully below, the non-disclosure and non-repatriation of those assets is a breach of the Settlement Agreement. Further, and as a result of that breach, the Applicants are entitled to seek a judicial determination from the Australian Federal Court that they can take title to those assets under the Settlement Agreement.

9.     The Subpoena Recipients are:

---

Pty Ltd; Lachlan Produce Pty Ltd; Lachlan Tesco Holdings Pty Ltd; Lodi Pty Ltd; and Moora Farming Pty Ltd. *See id.* ¶ 6.

[2] Depending on the discovery results obtained if this Application is granted, the Applicants may choose and reserve the right to seek further relief from this Court in order to serve subpoenas on additional recipients and/or seek information about additional discovery targets.

    i.    UBS AG, a Swiss bank that maintains a branch in New York located at 1285 Avenue of the Americas, New York, New York 10019 ("UBS");

    ii.    Midland States Bank, an Illinois bank with a branch in the Southern District of New York at 120 White Plains Road, Suite 135, Tarrytown, New York 10591 ("Midland States");

    iii.    Pershing LLC, a Delaware corporation registered to do business in New York and operating from an office in New York at 240 Greenwich Street, New York, NY 10286;

    iv.    The Federal Reserve Bank of New York, operating from 33 Liberty Street, New York, NY 10045, as a provider of the Fedwire Funds Service through its Wholesale Product Office ("Fedwire").

10.    UBS AG has acted as a routing bank for payments to the Discovery Targets. *See* Yeo Decl. ¶¶ 58, 59. Midland States Bank and Pershing LLC appear to hold financial accounts for Mr. Rennie and the Discovery Targets. *See* Yeo Decl. ¶ 57-59.. Fedwire, operated by the Federal Reserve, processes around $3.1 trillion in payments daily. *See* Yeo Decl. ¶ 61.

11.    The Discovery Targets include:

    i.    Paul and Bridgit Rennie;

    ii.    Holland Management Limited, a company incorporated in the BVI ("Holland Management");

    iii.    Karinga Investments Limited, a company incorporated in the BVI ("Karinga Investments"); and

    iv.    Karinga/King Ranch LLC, a company incorporated in Colorado ("Karinga/King Ranch").

*See id.* ¶ 8, 9.

### III.    FACTUAL BACKGROUND

#### A.  THE ATO INVESTIGATION

12.     In 1997, the Australian Taxation Office ("ATO") commenced an investigation into the financial affairs of Mr. Rennie and companies owned and operated by him, including RP and RPA. *See* Yeo Decl. ¶ 18.

13.     Through their investigation, the ATO identified several tax fraud and tax evasion schemes perpetrated by Mr. Rennie and his companies (the "Tax Schemes"). *See id.* ¶ 19.

14.     One of the Tax Schemes involved the dissipation of funds through various shell entities in the name of Hong Kong-based businessman, Alan Cheung (also known as Zhang Fang Zhou) (the "Alan Cheung Scheme"). *See id.* ¶ 20. In the Alan Cheung Scheme, the Rennie Companies purportedly provided services and sold plant breeder rights through various BVI and Hong Kong entities to companies owned and controlled by Mr. Cheung. *See id.* There is no evidence of any services or consideration actually having been provided. *See id.* Nonetheless, Mr. Cheung's companies received at least AUD $7,063,947 million (approximately US $5.4 million) under these schemes and Mr. Rennie's companies claimed tax deductions for the payments in the schemes. *See id.* & Exs. 15–18 to Yeo Decl.

15.     Eventually, through its investigation into the Tax Schemes, the ATO identified tens of millions of Australian dollars in unpaid tax liabilities from RP and RPA (the two Rennie Companies of which the Applicants are liquidators), as follows:

> i.    RP has an unsatisfied tax liability of AUD $10,342,745.12 (approximately US $8.0 million) to the ATO. *See* Yeo Decl. ¶ 21 & Ex. 5.

ii.     RPA has an unsatisfied tax liability of AUD $51,270,274.81 (approximately US $39.5 million) to the ATO. *See id.* ¶ 21 & Ex. 6.

**B.   THE AUSTRALIAN LIQUIDATION AND RECOVERY PROCEEDINGS**

16.     The Applicants were appointed as liquidators of RPA on August 9, 2010, and as liquidators of RP on May 19, 2011. *See id.* ¶ 17.

17.     Upon the Applicants' appointment as liquidators, the Applicants identified what appeared to be transactions entered into by RPA, its former directors and associated entities (the "Rennie Group"), for the purposes of removing assets outside the reach of RPA's principal creditor, the ATO. *See id.* ¶ 22. On February 28, 2011, the Applicants commenced proceeding VID 159 of 2011 in the Victorian district registry of the Australian Federal Court, under section 588FF of Australia's Corporations Act 2001 and in the Australian Federal Court's accrued and equitable jurisdiction, to recover to RPA, for the benefit of its creditors, moneys paid to various related parties in transactions that were entered into at a time when RPA was insolvent for the purpose of defeating the interests of RPA's principal creditor, the ATO (the "Australian Recovery Proceedings"). *See id.* ¶ 24. A true and correct copy of the March 1, 2011 Statement of Claim is attached as Exhibit 8 to the Yeo Decl.

18.     By November 2011, the value of claims or potential claims on behalf of the Rennie Companies against Mr. Rennie and others was approximately AUD $80 million (approximately US $60 million). *See id.* ¶ 25. At the same time, the Rennie Companies owed more than AUD $50 million to the ATO. *See id.*

19.     Presently, the ATO is the sole creditor of both Rennie Companies. *See id.* Based on current exchange rates, the Rennie Companies are indebted to the ATO for approximately US $38 million. *See id.*

### C. THE SETTLEMENT AGREEMENT AND MR. RENNIE'S OBLIGATION TO REPATRIATE FUNDS

20.    On October 3, 2012, after engaging in mediation in November 2011 and again in April 2012, Mr. Rennie, the Rennie Parties, and the Applicants entered into a full and final settlement of the Australian Recovery Proceedings through the Settlement Agreement.[3] *See* Yeo Decl. ¶¶ 26, 27. A true and correct copy of the Settlement Agreement is attached as Exhibit 10 to the Yeo Decl.

21.    Pursuant to the Settlement Agreement, Mr. Rennie and the Rennie Parties were to pay to the Applicants the proceeds of the sale of Mr. Rennie's potato business and to repatriate to Australia funds held offshore for their benefit (the "Offshore Funds"), which funds would be distributed to the Rennie Parties and the Applicants pursuant to a schedule set forth in the Settlement Agreement. *See id.* ¶¶ 29-32 & Ex. 10.

22.    Specifically, under the Settlement Agreement:

    i.    The first AUD $2,556,573.06 in Offshore Funds to be repatriated (the "Repatriated Rennie Sums") would be transferred to the Applicants (Clause 3.7);

    ii.    Further Offshore Funds repatriated over and above AUD $2,556,573.06, but under AUD $13 million (the "Repatriated Rennie Funds") would be retained by the Rennie Parties (Clause 2.13);

    iii.    The Rennie Parties were required to repatriate any remaining Offshore Funds above AUD $13 million to Australia, in which case they would share those funds 50-50 with the Applicants (Clause 3.9); and

---

[3] On April 5, 2013, the Settlement Agreement was amended by a Deed of Variation, but the amendment affects clauses that are not material to this Application. *See* Yeo Decl. ¶ 25.

iv.    Although the Rennie Parties were obligated to repatriate all the Offshore Funds, to the extent that any Offshore Funds were not repatriated within six months of the execution of the Settlement Agreement, they would become the property of the Applicants (Clause 3.11).

*See id.* ¶ 32 & Ex. 10.

23.    As noted above at paragraph 22(iii), pursuant to Section 3.9 of the Settlement Agreement, the Rennie Parties were to repatriate any other funds in excess of the initial AUD $13 million located outside of Australia as of the execution of the Settlement Agreement (the "Offshore Funds") within six months and share those with the Applicants. *See id.*

24.    In the event the Rennie Parties failed to repatriate and turn over the Additional Repatriation Amount, "the Rennie Parties . . . assign[ed] to the Liquidators (i.e., the Applicants) all right, title and interest in any amount of Offshore Funds[.]" *See id.* Ex. 10, at § 3.11. In other words, the Applicants are entitled to seek a judicial adjudication that they have a legal right to any Offshore Funds that the Rennie Parties failed to repatriate within six months of the execution of the Settlement Agreement. *See id.* ¶¶ 30-33.

25.    Pursuant to the Settlement Agreement, the Rennie Parties have repatriated a total of AUD $13,431,896.67, which has been allocated to the Rennie Parties and the Applicants as set out in the Settlement Agreement. *See id*. ¶ 39.

**D.  The Applicants Uncover Evidence that the Rennie Parties Have Breached the Settlement Agreement by not Repatriating All Offshore Funds**

26.    The Applicants have uncovered evidence that the Rennie Parties have not repatriated all Offshore Funds to Australia. *See id.* ¶ 40. Because more than six months have passed since the Settlement Agreement was executed, the Rennie Parties are in breach of Section 3.9 of

the Settlement Agreement. *See id.* ¶ 39, 48. Further, under Section 3.11 of the Settlement Agreement, the Applicants are entitled to seek a judicial adjudication that the right, title and interest to the un-repatriated Offshore Funds should transfer to the Applicants and are assets of the Rennie Companies in their liquidation before the Australian Federal Court. *See id.* ¶¶ 48, 49.

27.     In particular, the Applicants have obtained records of wire transfers from DMS Bank in Hong Kong that show that Harrow and Trimaran—two of the BVI companies that appear to hold funds for the benefit of Mr. Rennie (as set out in the Prior Application)—collectively transferred USD $1,655,477 to Peng Fu Limited, a Hong Kong company, in March 2013. *See id.* ¶ 41, 43. This was just before the six-month deadline to repatriate funds (*i.e.*, April 4, 2013). *See id.* According to account opening documents for Peng Fu, Mr. Alan Cheung, the businessman and associate of Mr. Rennie who received funds as part of the Alan Cheung Schemes, was a signatory for the Peng Fu accounts. *See id.* ¶ 42. True and correct copies of the account opening documents are attached as Exhibit 30 to the Yeo Decl.

28.     The transfers which show the payment of over US $1.6 million into Peng Fu are as follows:

| Date | Amount USD | Transferor | Transferee | Exhibit to Yeo Decl. |
|------|-----------|------------|------------|----------------------|
| March 7, 2013 | $899,999 | Harrow (Bank Sal. Oppenheim) | Peng Fu Limited (DBS Bank) | 28 |
| March 13, 2013 | $699,990 | Harrow (Bank Sal. Oppenheim) | Peng Fu Limited (DBS Bank) | 28 |
| March 28, 2013 | $55,488.37 | Trimaran (Mizrahi Tehafot Bank) | Peng Fu Limited (DBS Bank) | 29 |
| Total | $1,655,477.00 | | | |

29.     Of those funds, only US $1.2 million was repatriated to Australia via Mr. Rennie's SCB account in Hong Kong. *See* Yeo Decl. ¶¶ 43-44. True and correct copies of the wire transfer records are attached as Exhibits 22 and 43 to the Yeo Decl. The remaining US $455,000 was

instead sent to accounts at Bank of Communication Co. in Hong Kong held by Will Power Trading and Prosperity. *See id.* ¶ 45. Will Power (a BVI company) and Prosperity (a Hong Kong company) appear to be companies controlled by Alan Cheung, who is a signatory to the companies' accounts at Bank of Communication Co. *See id.* As stated above, the ATO previously uncovered several tax fraud and tax evasion schemes whereby Mr. Rennie and his companies dissipated funds through companies controlled by Mr. Cheung. *See id.* ¶¶ 19, 20.

30.     Additionally, in connection with the mediation and settlement negotiations, Mr. Rennie (presumably, inadvertently) disclosed the existence of a BVI entity believed to be under his control, Harrow, and that Harrow maintained an account at Bank Sal Oppenheim in Switzerland. *See id.* ¶ 26. This came to light when, in June 2012, after the parties had agreed to the principal terms of a settlement and just as the settlement agreement was about to be finalized, a dispute arose which jeopardized the settlement. *See id.* To resolve the dispute, the Applicants required an immediate payment of AUD $1 million. *See id.* The Applicants were aware that Mr. Rennie held sufficient funds in Australia to make the payment. *See id.* Nonetheless, Mr. Rennie caused the AUD $1 million payment to be made into his solicitor's trust account from an account held in the name of Harrow at Bank Sal Oppenheim in Switzerland. *See id.* A true and correct copy of the AUSTRAC payment advice is attached as Exhibit 9 to the Yeo Decl. As set out below, Harrow was also a company that received funds as part of the Tax Schemes.

31.     Further, the Applicants have uncovered evidence from the Australian police that Mr. Rennie instructed Bank Mizrahi to make transfers from an account in the name of Bondi Investments Limited ("Bondi") to an account in the name of Trimaran Holdings Limited ("Trimaran"). *See* Yeo Decl. ¶ 52(iii). As set out above, Trimaran is an entity that was involved in

the repatriation of funds further to the Settlement Deed. *See id.* ¶ 52(iv). It also received funds as part of the Tax Schemes, as set out below.

32.     In addition, as a result of ongoing investigations, the Applicants uncovered evidence that RPA and other companies within the Rennie Group (for example, Moora Farming Pty Ltd and Meeweella Pty Ltd) expatriated funds in excess of AUD $21 million from Australia to offshore companies during the period of the Tax Schemes investigated by the ATO. *See id.* ¶ 34. These transfers are summarized below:

| Transferee | Period | Receiving Bank | Amount AUD | Exhibit to Yeo Decl. |
|---|---|---|---|---|
| Harrow | June 30, 1997 to June 12, 1998 | Mizrahi | $3,258,875.00 | 12 |
| Trimaran | June 29, 1999 to June 25, 2002 | Mizrahi | $1,203,674.00 | 13 |
| Lexington Provident | September 30, 2004 to July 1, 2010 | Bank Sal. Oppenhiem | $10,191,903.96 | 14 |
| GII | June 24, 2005 to March 4, 2008 | HSBC Hong Kong | $981,320.00 | 15 |
| ITS | June 24, 2005 to March 11, 2009 | Bank of Communications | $2,349,672.00 | 16 |
| Media Plus | April 4, 2007 to May 8, 2007 | Bank of Communications | $112,500.00 | 17 |
| Champion Grow | April 13, 2007 to September 30, 2009 | DBS | $3,620,455.00 | 18 |
| | | | **TOTAL** $21,718,399.96 | |

33.     Given the evidence that AUD $21.7 million was expatriated from Australia and only AUD $13.43 million was repatriated to Australia, in conjunction with (i) Mr. Rennie's history of the Tax Schemes, (ii) the additional evidence of expatriation of funds to accounts in the names of Harrow and Trimaran on the eve of the repatriation deadline, (iii) Mr. Rennie's apparently inadvertent disclosure of Harrow and its Swiss bank account during settlement negotiations, and (iv) the evidence of Mr. Rennie causing wire payments to be made from Bondi to Trimaran, the Applicants believe discovery in this District will produce evidence of further expatriation and

concealment of Offshore Funds which will support a legal claim that the Rennie Parties breached the Settlement Agreement by failing to repatriate all Offshore Funds and that the Applicants are entitled to recover those funds under the Settlement Agreement. *See* Yeo Decl. ¶¶ 19, 20, 26, 34, 46-54.

34.     Finally, financial records produced in response to subpoenas served on financial institutions following the Court's granting of the Prior Application have shown that several of Mr. Rennie's companies, including Lexington Provident (a Guernsey company) and North Acton (a BVI company), held funds in offshore accounts long after the repatriation deadline.  *See* Yeo Decl. ¶ 47.

### E.    THE APPLICANTS ARE ENTITLED TO BRING A BREACH OF SETTLEMENT CLAIM IN AUSTRALIA AND RECOVER THE OFFSHORE FUNDS

35.     The Applicants have a claim for breach of Clause 3.9 of the Settlement Agreement to any Offshore Funds not repatriated to Australia. *See id.* ¶ 48. Further, pursuant to Clause 3.11 of the Settlement Agreement, the Applicants may seek a judicial determination that they are entitled to take title to Offshore Funds over and above AUD $13 million that were not repatriated to Australia within the 6-month repatriation period. *See id.* ¶¶ 48–49.

36.     Based on evidence already obtained, the Applicants believe that there was at least US $455,000 in Offshore Funds over and above AUD $13 million (approximately US $10 million) that was not repatriated to Australia but instead diverted to accounts in Hong Kong. *See id.* ¶ 50. These are the funds that were sent by Harrow and Trimaran to Peng Fu, and subsequently remitted to Will Power and Prosperity Finance. *See id.*

37.     Additionally, and as noted at paragraph 33 above, the Applicants are aware that over AUD $21.7 million was expatriated by Mr. Rennie and entities associated with him, and only AUD $13.4 million was repatriated. *See id.* ¶ 35. There is compelling evidence that the Discovery

Targets are entities that are holding funds for the benefit of Mr. Rennie and/or the Rennie Parties, and hence their assets are "Offshore Funds" within the meaning of the Settlement Agreement. *See id.* ¶ 52. For instance:

    i.    Holland Management, Karinga Investments, and Karinga/King Ranch received their funds from Lexington Provident, a company which in turn received over AUD $10 million as part of the Tax Schemes. *See id.* ¶ 52(i) & Ex. 14.

    ii.    Further, Lexington Provident is owned in part by Pembrokeshire, which was a front for Mr. Rennie. *See id.* ¶ 52(ii). Pembrokeshire was the sole director of Bondi and Trimaran, two companies that Mr. Rennie appears to have used to hold his funds. *See id.* ¶ 52(ii). Pembrokeshire's director was Mr. Erdynast. *See id.* ¶ 52(v).

    iii.    Hand-written facsimiles were seized from a drawer in a cupboard of Mr. Rennie's bedroom that showed two transfers from an account in the name of Bondi to Trimaran at the United Bank of Mizrahi, Israel. *See id.* ¶ 52(iii)

    iv.    Further, Trimaran received funds as part of the Tax Schemes and also repatriated funds through Peng Fu, as explained above. It was the sole unit holder of the Rennie Produce (Aust) Unit Trust, for which RPA is trustee, during the financial years 1999 to 2003. *See id.* ¶ 52(iv). Accordingly, Trimaran was the main beneficiary of Mr. Rennie and Rennie Group's Australian potato farming business during this period. *See id.*

    v.    Trimaran participated in the repatriation of funds pursuant to the Settlement Agreement through Peng Fu. *See id.*

38.     Either Karinga Investments (the BVI company) or Karinga/King Ranch LLC (the Colorado company) received funds from Lexington Provident, though it is not clear which one received the funds. *See id.* ¶ 53. The wire records previously produced by UBS bank further to the Prior Application identify the recipient as "KARINGA INV.INC. DBA KING RANCH," which could refer to either entity. *See id.* Accordingly, Applicants seek records for both companies. *See id.* The two companies appear to be affiliated, in any case, for example, sharing the same registered address at PO Box 1657, Basalt, Colorado 81621, and the same registered agent, Robyn J. Lawry. *See id.*

39.     Further, Mr. Rennie appears to have an interest in the Discovery Targets through his connection to Mr. Erdynast. *See id.* ¶ 52(v). For instance:

i.     Mr. Erdynast is a solicitor who together with his partner, Warwick Mowbray, were instrumental in setting up the Tax Schemes for Mr. Rennie. *See id*. When the Australian Federal Police raided the offices of Mowbray Erdynast in mid-2000, they found that Mr. Rennie was one of Mr. Erdynast's largest clients. *See id.* Apparently, Mr. Mowbray and Mr. Erdynast fled the country that day and have never returned to Australia. *See id*.

ii.     On October 31, 2011, Harneys issued a notice addressed to Mr. Abe Erdynast of its intention to resign as the BVI registered agent of Holland Management, Karinga Investments, Harrow, Trimaran, Pembrokeshire, North Acton, and Bondi. *See id*. Based on Harneys' October 31, 2011 letter, it seems that Mr. Erdynast was a point of contact for these companies on behalf of Mr. Rennie. *See id*.

iii.     Mr. Erdynast was the director of Pembrokeshire. *See id*.

iv. This conclusion is also supported by the sworn testimony by Mr. Rennie conducted in the Federal Court of Australia, which confirms that Mr. Erdynast managed the flow of funds to and from various BVI entities ultimately controlled by Mr. Rennie:

   i. The transfer of ownership of units in the Rennie Produce (Aust) Trust was a result of acting on the advice of his solicitors Mr. Erdynast and Mr. Wawrick Mowbray. *See* Yeo Decl. ¶ 52(vi)(a) & Ex. 45 at 48:31.

   ii. Mr. Rennie paid dividends to Trimaran from the Rennie Produce (Aust) Trust as a result of acting on the advice of Mr. Erdynast and Mr. Mowbray. *See* Yeo Decl. ¶ 52(vi)(b) & Ex. 45 at 49:10 & 50:10.

   iii. Mr. Rennie gave instructions to Mr. Erdynast to send all offshore funds back to Australia. *See* Yeo Decl. ¶ 52(vi)(c) & Ex. 45 at 14:45.

   iv. Mr. Rennie gave instructions to Mr. Erdynast which resulting in the repatriation of the AUD $1 million during the settlement negotiations. *See* Yeo Decl. ¶ 52(vi)(d) & Ex. 45 at 19:30.

40. In sum, the Applicants have compelling reasons to believe that the Discovery Targets are controlled by Mr. Rennie and the Rennie Parties, and that the Discovery Targets control Offshore Funds subject to the Settlement Agreement, but they seek additional evidence of the existence of such Offshore Funds to support their claim in Australia.

41. The Applicants already have retained solicitors in Australia to advise them on, and to prepare, the Applicants' contemplated claim in Australia. *See id.* ¶ 54. By this Application they seek evidence in support of the contemplated claim before the Australian Federal Court seeking a

judicial adjudication that the Rennie Parties breached the Settlement Agreement and that the Applicants may take title to the Offshore Funds. *See id.* ¶¶ 12-14.

42.     This Application is made to obtain further discovery of bank account records and wire transfer records of payments made or received by the Discovery Targets. *See id.* ¶ 55. This will be important evidence for the Applicants' contemplated claim in Australia for breach of Clause 3.9 of the Settlement Agreement and for their claim to ownership of Offshore Funds not repatriated to Australia under Clause 3.11 of the Settlement Agreement.  *See id.* The Applicants do not however expect the Subpoena Recipients themselves to be defendants in the contemplated claim in Australia. *See id.*

43.     As noted, this Application seeks discovery from Pershing LLC, Midland States Bank, UBS AG, and Fedwire.  *See id.* ¶ 56.

44.     The Rennies' joint account referenced above appears to be a superannuation fund at Pershing LLC, as shown in wire records received from BNY Mellon. *See id.* ¶ 57.  Applicants have identified a "Paul and Bridgit Rennie Superannuation Fund" registered on the Australia Business Register ("ABN"), but the ABN does not state where its bank accounts are held.  *See id.* It appears that the account at Pershing is for this fund. *See id.* Applicants therefore seek account application/opening documents and bank statements for the fund, so as to help identify if it contains any Offshore Funds as defined in the Settlement Agreement. *See id.*

45.     According to wire records from 2008 produced by UBS, the Discovery Targets appear to have accounts at Alpine Bank & Trust Co. *See id.* ¶ 58.  Recently, Midland States Bank became the successor to Alpine Bank & Trust Co.  *See id.* As noted on the website of the Federal Financial Institutions Examinations Council, Alpine Bank was purchased by Midland States Bank on July 14, 2018 and became a branch of that bank on the same day. *See id.* Midland States Bank

operates in the Southern District of New York through its branch in Tarrytown, NY. *See id.* Applicants therefore seek account application/opening documents and bank statements from Midland States Bank for the Discovery Targets, to help identify if they hold any Offshore Funds as defined in the Settlement Agreement. *See id.*

46.     Wire records show that UBS has acted a routing bank for wire payments to the Discovery Targets' accounts at Alpine Bank & Trust Co. *See id.* ¶ 59.  An extract from these records are attached as Exhibit 50 to the Yeo Decl.  . The Applicants therefore seek additional discovery from UBS for evidence on any further wire payments to the Discovery Targets. *See id.*

47.     According to its website, Fedwire "processes and settles payment orders individually in real time throughout the operating day. *See id.* ¶ 61. Participants can send up to one penny less than $10 billion in a single transaction." *See id.* It "frequently handles what are considered "retail" payments (i.e., funds transfers that are not interbank transfers). *See id.* The latter includes funds transfers sent by or to consumers."  *See id.* Because Fedwire would likely have information about wire transfers made to and from the newly identified bank accounts and entities, Applicants seek additional discovery from Fedwire as well.  *See id.*.

48.     As such, the Applicants seek discovery within the Southern District of New York to obtain evidence regarding the existence and transfers of the Rennie Parties' Offshore Funds, as the Applicants have a legal entitlement to seek a judicial adjudication that there was a breach of contract and that they have title to those funds under Section 3.11 of the Settlement Agreement. *See id.* ¶¶ 55, 62

49.     Further, the Subpoena Recipients and Discovery Targets are beyond the jurisdictional reach of the Australian Federal Court for purposes of discovery. *See id.* ¶ 65.  As a

result, the Applicants are unable to obtain the full scope of needed discovery within Australia due to the extraterritorial location of the Subpoena Recipients and Discovery Targets. *See id.*

F. **THE AUSTRALIAN FEDERAL COURT HAS AUTHORIZED THE APPLICANTS TO FILE THIS APPLICATION**

50.     On October 5, 2018 the Applicants, in their capacity as the Liquidators of the Rennie Companies, applied to the Federal Court of Australia for approval to seek discovery in the United States pursuant to 28 U.S.C. § 1782. *See id.* ¶ 14. They included with their filing a draft of this Application for review and consideration by the Federal Court of Australia. *See id.* A true and correct copy of the October 5, 2018 application to the Federal Court of Australia and certain exhibits thereto are attached as Exhibit 1 to the Yeo Decl.

51.     On October 11, 2018, the Federal Court of Australia approved the Applicants' request to pursue this Application to seek documents from the Subpoena Targets. *See id.* ¶ 15. A true and correct copy of the October 11, 2018 order is attached as Exhibit 2 to the Yeo Decl.

## IV.     RELIEF REQUESTED

52.     The Applicants are seeking to obtain evidence in the United States in furtherance of the contemplated Breach of Settlement Agreement Proceeding that they intend to file in the Australian Federal Court. *See* Yeo Decl. ¶¶ 55, 62. Specifically, the Applicants seek to obtain from the Subpoena Recipients located within this District records evidencing transfers of funds to and from the Discovery Targets. *See id.* ¶ 56. The Applicants expect that the documents requested will provide the Applicants with important information showing the existence of Offshore Funds which demonstrates a breach of the Settlement Agreement and to which the Applicants will seek a judicial determination that they have the legal right to recover. *See id.* ¶¶ 55, 62. As discussed herein, the Applicants have compelling reasons to believe that the Discovery Targets are controlled by Mr.

Rennie and the Rennie Parties, and that the Discovery Targets control Offshore Funds subject to the Settlement Agreement. *See id.* ¶¶ 51–52.

53.     Accordingly, the Applicants seek discovery in this District on an *ex parte* basis from the Subpoena Recipients about transfers to and from the Discovery Targets. *See id.* ¶¶ 55, 56. The Applicants are prepared to pay reasonable expenses that the Subpoena Recipients may incur in producing the documents required by the subpoenas accompanying this application. *See id.* ¶ 68. Copies of proposed subpoenas to the Subpoena Recipients are attached to the Stein Declaration as Exhibits 1-4. A copy of the proposed Order granting the aforementioned relief is being submitted in conjunction with this application**.**

## V.     MEMORANDUM OF LAW

Title 28, United States Code, Section 1782 ("Section 1782") authorizes discovery by litigants or other "interested persons" for use in proceedings before foreign and international tribunals. In pertinent part, it states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

The twin goals of the statute are "to provide equitable and efficacious discovery procedures in the United States courts for the benefit of tribunals and litigants involved in litigation with international aspects and to encourage foreign countries by example to provide similar means of assistance to our courts." *Brandi-Dohrn v. IKB Deutsch Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (internal quotation omitted) (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 99–

100 (2d Cir. 1992)). "In pursuit of these twin goals, the statute has, over the years, been given increasingly broad applicability." *Brandi-Dohrn*, 673 F.3d at 80 (quoting *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993)).

Here, the Court should issue an order granting the Applicants' *ex parte* Application for discovery because the Applicants have met the statutory prerequisites for relief under Section 1782, and because the factors to be weighed by the Court in exercising its discretion balance in favor of discovery.

## A. THE APPLICATION MEETS THE STATUTORY PREREQUISITES FOR RELIEF UNDER SECTION 1782

A Court has the authority to grant a discovery request pursuant to Section 1782 if the following statutory requirements are met: "(1) that the person from whom discovery is sought reside (or be found) in the district of the district court to which the application is made, (2) that the discovery be for use in a proceeding before a foreign tribunal, and (3) that the application be made by a foreign or international tribunal or 'any interested person.'" *In re Application of Esses,* 101 F.3d 873, 875 (2d Cir. 1996); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004). Each of these statutory requirements is met here.

### i.    The Subpoena Recipients are found in this District.

First, the Subpoena Recipients are found in this District. *See In re Application of Schmitz,* 259 F. Supp. 2d 294, 296 (S.D.N.Y. 2003) ("Application of section 1782 does not involve an analysis of . . . why a respondent has the documents. It is sufficient that respondents reside in this district, as they concededly do."). Namely, the Subpoena Recipients are financial institutions, correspondent banks, and a wire-transfer clearing house that regularly conduct business in this District, maintain their headquarters in this District, and/or are incorporated in New York. *See* ¶ 9, *infra*.

### ii.     The discovery is sought for use in a foreign proceeding.

As to the second requirement, the discovery sought must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a); *see Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015) (authorizing discovery for use in a contemplated Dutch proceeding). The "for use" requirement is met where the applicant is, or will be, a party to a foreign proceeding with the procedural right to submit evidence, without regard as to whether the evidence will ultimately be admissible in the foreign tribunal. *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (finding the "for use" statutory requirement met where the applicants were "parties to that [foreign] proceeding," and "retain[ed] the procedural right to submit the requested documents to the magistrate overseeing the investigation"); *Brandi-Dohrn*, 673 F.3d at 82 (holding that "a district court should not consider the *discoverability* of the evidence in the foreign proceeding, [and] it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application").

Additionally, the "for use" requirement is met even when there is no pending foreign proceeding, so long as one is within reasonable contemplation. *See Mees*, 793 F.3d at 299-300 (citing *Intel Corp.,* 542 U.S. at 259) (foreign proceeding must "be within reasonable contemplation," but need not be "pending" or "imminent.")). To demonstrate that the action is within reasonable contemplation, a petitioner "must provide some objective indicium that the action is being contemplated . . . . At a minimum, a Section 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *Certain Funds, Accounts and/or Inv. Vehicles v. KPMG LLP,* 798 F.3d 113, 123–24 (2d Cir. 2015).

In this case, the request for judicial assistance seeks evidence to be used in aid of the Breach of Settlement Agreement Proceeding that the Applicants intend, and for which they are actively preparing, to commence against Mr. Rennie and the Rennie Parties before the Australian Federal Court. To gather this important information, the Applicants have already obtained certain discovery as a result of subpoenas authorized by this Court and commenced related discovery proceedings in the BVI. *See* Yeo Decl. ¶ 54. The evidence sought in this District is different than and will supplement the evidence the Applicants have already collected and are in the process of collecting in other jurisdictions. *See id*. ¶¶ 54, 56. This application is aimed at obtaining new evidence from financial institutions, routing banks, and a clearing house which will show the existence of undisclosed funds. *See id*. ¶ 56.

As such, even though the Breach of Settlement Agreement Proceeding is contemplated and not yet pending, it nevertheless qualifies as "a proceeding in a foreign or international tribunal" because the Applicants' retention of Australian counsel and ongoing efforts to gather the required pre-suit evidence, including by commencing this proceeding, are objective factors demonstrating that the Breach of Settlement Agreement Proceeding is more than speculative and is reasonably likely to be commenced within a reasonable amount of time. *Mees*, 793 F.3d at 299-300 (authorizing discovery that would be used to both plead and to prove a claim in contemplated litigation); *see generally Intel*, 542 U.S. at 258 ("Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings.").

Further, when the Applicants commence the Breach of Settlement Agreement Proceeding, under the relevant rules of the Australian Federal Court, the Applicants will have the procedural right to present evidence, including the evidence gathered here, to the Australian Federal Court in

support of their claims. *See* Yeo Decl. ¶ 66. Accordingly, the evidence sought here meets the "for use" requirement. *See In re Accent Delight Int'l Ltd.*, 869 F.3d at 132.

      **iii.**    **The Applicants are interested persons.**

As to the third requirement, the Applicants qualify as "interested person[s]" because they are the potential plaintiffs in the contemplated Breach of Settlement Agreement Proceeding against Mr. Rennie and the Rennie Parties. In addition, as explained above, the Applicants are the liquidators of RP and RPA, commenced the Australian Recovery Proceedings to recover assets on behalf of RP's and RPA's creditors, and are parties to the Settlement Agreement with Mr. Rennie and the Rennie Parties that they believe has been breached. *See Intel*, 542 U.S. at 256 & 258 ("No doubt litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782," and finding that "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings."); *In re Application of Esses*, 101 F.3d at 875 (citing the legislative history of Section 1782 at S. Rep. No. 1580, 88th Cong., 2d Sess., at 8 (1964)).

For these reasons, this application meets the statutory requirements for relief under Section 1782.

**B.**  **THE DISCRETIONARY *INTEL* FACTORS WEIGH IN THE APPLICANTS' FAVOR AND THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT RELIEF**

Once, as here, an applicant meets the Section 1782 statutory criteria, the Court should determine whether to exercise its discretion to permit the discovery. District courts have broad discretion in granting judicial assistance to foreign tribunals to obtain evidence for use in a foreign proceeding, and should do so to "advance the twin aims of [Section 1782], which are to provide efficient means of assistance to participants in international litigation in our federal courts and to encourage foreign countries by example to provide similar means of assistance to our courts." *See*

*In Re Servicio Pan Americano de Proteccion, C.A.*, 354 F. Supp. 2d 269, 273 (S.D.N.Y. 2004) (internal quotations omitted). In deciding whether to exercise its discretion to permit the Section 1782 discovery, the Court should consider: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request is "an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65. Here, each of these factors supports granting the Application, and favors allowing the requested relief for the following reasons.

First, the Subpoena Recipients are not parties to the Australian Liquidation Proceeding or the Australian Recovery Proceedings, and are not expected under any circumstance to be parties to or otherwise appear in the Breach of Settlement Agreement Proceeding. *See* Yeo Decl. ¶¶ 55 & 65. As such, discovery pursuant to Section 1782 in this circumstance is precisely what courts have held the statute is for. *See, e.g.*, *In re Application of Guy*, No. M 19-96, 2004 WL 1857580, at *2 (S.D.N.Y. Aug. 19, 2004) (authorizing discovery into a non-party and noting that Section 1782 discovery may be the only way in which an interested party can obtain discovery from non-parties that are not subject to the foreign tribunal's jurisdiction) (citing *Intel,* 542 U.S.. at 264); *In re Consellior SAS, Kerfraval Ass'n De Documentation Pour L'industrie Nationale*, No. 13 MC 34 (WWE), 2013 WL 5517925, at *2 (D. Conn. Oct. 2, 2013) (granting Section 1782 application in part because respondents were not parties to French proceeding, "and therefore, the French Court cannot order them to produce discovery").

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *In Re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d at 274 (quoting *Intel,* 124 U.S. at 264). Here, the Australian Federal Court's express approval of the filing of this Application demonstrates that the Australian Federal Court is receptive to this Court's assistance in obtaining evidence for use in that forum. *See* Yeo Decl. ¶ 14-15 & Exs. 1–2. Additionally, the Applicants are not aware of any law, rule of evidence or procedure in Australia that conflicts with the provision of assistance by United States courts, and the Applicants are not aware of any basis to believe that the Australian Federal Court would not be receptive to the assistance in this instance. *See id*. ¶¶ 66-67.

Third, the Applicants are not using this proceeding to circumvent foreign proof gathering limits in Australia, or any limits imposed by the laws of the United States. *See Intel*, 542 U.S. at 265. Rather, the Applicants have received permission from the Australian Federal Court to initiate this proceeding to gather evidence from entities that will not be parties to the Breach of Settlement Agreement Proceeding and over which the Australian Federal Court does not have jurisdiction, but who likely are in the possession, custody, or control of evidence relevant to the Breach of Settlement Agreement Proceeding.  *See* Yeo Decl. ¶¶ 15, 55 & 65. Further, the Applicants are not aware of any Australian law that prohibits the discovery sought. *See id*. ¶¶ 67.

Finally, the Applicants' discovery requests are not "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, focusing as they do upon evidence relevant to identifying the existence and movement of the Offshore Funds. The Applicants are seeking records from financial institutions that maintain such records in the regular course of business and that routinely produce such records in response to U.S. discovery requests. *See In re Application of Inversiones y Gasolinera Petroleos*

*Venezuela,* 2011 WL 181311 at *13 (S.D. Fla. Jan. 19, 2011) (allowing discovery under Section 1782 absent "specific showing" of burden or intrusive nature of request by respondent). Nor did the Prior Application under Section 1782 seek the same discovery. *See* Yeo Decl. ¶ 56.

Accordingly, the Court should grant the Application.

### C.  THE COURT SHOULD GRANT THE APPLICATION *EX PARTE*

"[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte.*" *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012). Here, the ATO and the Applicants have already uncovered evidence that Mr. Rennie and the Rennie Companies are prone to shielding assets from their creditors, including by expatriating funds on the eve of the six-month deadline to make payment of the Initial Repatriation Amount. As such, the Applicants make this Section 1782 Application without notice because they believe that if Mr. Rennie or his associates were to learn of these proceedings, they would take steps to further dissipate assets or place them beyond the reach of the Applicants. In addition, there are likely to be criminal sanctions for Mr. Rennie if he were found to have offshore assets that were not disclosed to the ATO, so Mr. Rennie would be further incentivized to prevent the Applicants from discovering such assets. Accordingly, the Applicants request that the Court grant this Application on an *ex parte* basis.

## VI.   CONCLUSION

WHEREFORE, Applicants Andrew Reginald Yeo and Gess Michael Rambaldi pray for an order of this Court:

(1)    granting discovery pursuant to Section 1782, including document requests as detailed in the proposed subpoenas attached to this Application;

(2)     ordering that Josef M. Klazen and Darryl G. Stein be authorized to issue the subpoenas attached to this application to obtain such discovery pursuant to the Federal Rules of Civil Procedure;  and

(3)     granting such other and further relief as this Court deems just and proper.


Dated: October 18, 2018                             Respectfully submitted,

                                                    **KOBRE & KIM LLP**

                                                    /s/ Josef M. Klazen
                                                    Josef M. Klazen
                                                    josef.klazen@kobrekim.com
                                                    NY Bar No. 442939
                                                    Darryl G. Stein
                                                    darryl.stein@kobrekim.com
                                                    NY Bar No. 5037825
                                                    800 Third Avenue
                                                    New York, New York 10022


                                                    *Counsel for Applicants Andrew*
                                                    *Reginald Yeo and Gess Michael*
                                                    *Rambaldi*